UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────────┐
│ BAINBRIDGE FUND LTD.,                     │
│                     Plaintiff,            │
│ -against-                                 │
│ THE REPUBLIC OF ARGENTINA,                │
│                     Defendants.           │
└─────────────────────────────────────────┘
```

No. 16 Civ. 08605 (LAP)

MEMORANDUM & ORDER

LORETTA A. PRESKA, Senior United States District Judge:[1]

Plaintiff Bainbridge Fund Ltd. ("Plaintiff") seeks turnover of Defendant the Republic of Argentina's ("Defendant" or "the Republic" or "Argentina") (i) 100% shareholding in Class A shares of YPF S.A. ("YPF") (the "Class A Shares"); (ii) 51% shareholding in Class D shares of YPF (the "Class D Shares");[2] and (iii) any assets currently held by the Bank of New York Mellon ("BNYM") in New York which represent receipts from the American Depositary Receipt ("ADR") program or American Depositary Shares ("ADSs") relating to such shares,[3] (collectively the "YPF Assets"), to

───────────────

[1] As Plaintiff acknowledges, Plaintiff's motion contains substantially similar arguments and supporting documentation to the Motion for Injunction and Turnover filed in Petersen Energía Inversora, S.A.U. v. Argentine Republic et al., No. 15 Civ. 2739 (LAP) and Eton Park Capital Management, L.P. v. Argentine Republic et al., No. 16 Civ. 8569 (LAP). The Petersen docket is cited throughout this order.

[2] The Class A Shares and Class D Shares are collectively referred to herewith as "the Shares."

[3] The Republic notes that it does not hold any ADRs or ADSs. (Def. Opp'n at 1; Pl. Reply at 11 n. 13.) Thus, the Court does not consider any ADRs or ADSs.

remedy the Court's unsatisfied judgment in the amount of approximately $95 million, pursuant to Federal Rule of Civil Procedure 69(a)(1), New York Civil Practice Law and Rules ("NY CPLR") § 5225(c), and New York Uniform Commercial Code ("NY UCC") § 8-112(e).[4] Plaintiff requests that the Court order the Republic to (i) transfer the Shares to a global custody account at BNYM in New York within 14 days from the date of this order; (ii) instruct BNYM to initiate a transfer of the Republic's ownership interests in its Class A Shares, Class D Shares, and any Republic assets currently held by BNYM which represent receipts from the ADR program or ADSs relating to such Class A Shares and Class D Shares to Plaintiff or its designees within one business day of the date on which the Class A Shares and Class D Shares are deposited into the account; and (iii) refrain from changing the powers of any class of shares of YPF. (Pl. Mot.)  Defendant opposes the motion.[5]

---

[4] (Pl. Mot. for Injunction and Turnover ("Pl. Mot."), dated May 3, 2024 [dkt. no. 106]; Pl. Mem. in Support of Mot. ("Pl. Mem."), dated May 3, 2024 [dkt. no. 107]; Decl. of Anthony J. Costantini ("Costantini Decl. 1"), dated May 3, 2024 [dkt. no. 108]; Pl. Reply in Support of Pl. Mot. ("Pl. Reply"), dated June 25, 2024 [dkt. no. 129]; Decl. of Anthony J. Costantini ("Costantini Decl. 2"), dated June 25, 2024 [dkt. no. 130].)

[5] (Def. Opp'n to Pl. Mot. ("Def. Opp'n"), dated June 11, 2024 [dkt. no. 123]; Decl. of Carmine D. Boccuzzi ("Boccuzzi Decl."), dated June 11, 2024 [dkt. no. 119]; Decl. of Rafael M. Manovil ("Manovil Decl."), dated June 11, 2024 [dkt. no. 120]; Decl. of Alfonso Santiago ("Santiago Decl."), dated June 11, 2024 [dkt. no. 121].)

The United States of America filed a statement of interest.[6],[7]  For the reasons set forth below, Plaintiff's motion is GRANTED in part and DENIED in part.

## I.  **Background**

The Court assumes familiarity with the factual background and procedural history of the case, which have been set out at length in prior opinions of this Court and the Court of Appeals.  The Court recounts only the facts necessary to determine the instant motion.

### a. **Factual Background**[8]

Prior to 1993, YPF, a petroleum company, was wholly owned and operated by the Republic.  Petersen Energia Inversora, S.A.U v. Argentine Republic et al. ("Petersen II"), 15 Civ. 2739 (LAP), 16 Civ. 8569 (LAP), 2023 WL 2746022, at *2 (S.D.N.Y. Mar. 31, 2023).

In 1993, the Republic decided to privatize YPF through a worldwide IPO of its shares.  Id.  The Republic acted "in its capacity as shareholder of [YPF]" to amend YPF's bylaws to include protections for investors.  Petersen Energia Inversora S.A.U. v.

---

[6] (U.S. Statement of Interest, dated Nov. 6, 2024 [dkt. no. 162]; Pl. Response to U.S. St., dated Nov. 13, 2024 [dkt. no. 163]; Def. Response to U.S. St., dated Nov. 18, 2024 [dkt. no. 166].)

[7] The parties and the United States filed supplemental briefs regarding the impact of the Court of Appeals' decision in Peterson v. Bank Markazi, 121 F.4th 983 (2d Cir. 2024) on this motion.  (See dkt. nos. 170, 173, 174.)

[8] The underlying facts in this case concern the Republic's default on certain global debt securities.

Argentine Republic et al. ("Petersen I"), 895 F.3d 194, 199 (2d
Cir. 2018).  Notably, the amended bylaws included, inter alia,
Section 7, the tender offer provisions.  Id. at 199-200.

In the Republic's efforts to privatize YPF, the Republic
specifically targeted its IPO at United States investors.  The
Republic sponsored an ADR program listed on the New York Stock
Exchange ("NYSE") for YPF's Class D shares with BNYM as the
depository bank, and it registered both YPF's Class D shares and
its ADRs representing interests in those shares with the United
States Securities and Exchange Commission ("SEC").  (Petersen dkt.
No. 558 ¶¶ 23-25.)  See also Petersen I, 895 F.3d at 199.  The
Republic "raised billions of dollars in investment capital with
the largest share (more than $1.1 billion in total) coming from
the sale of ADRs in the United States on the NYSE."  Id. at 200.
Repsol S.A. ("Repsol") emerged from the IPO as YPF's majority
shareholder.  Id.  The Republic remained a holder of YPF's Class
A Shares.[9]  Id.  Under Section 6 of the bylaws, only the National
Government can be the holder of said Class A shares; but, "Class
A shares of stock transferred by the National Government to any
person shall become class D shares of stock, except transfers to
the Provinces, if previously authorized by law, in which case they
will not be converted into another class."  (Santiago Decl. Ex.

---

[9] The Republic owns 3,764 Class A Shares of YPF, which represent
100% of the Class A shares.  (Costantini Decl. 1 Ex. 1 at 90.)

P.)    After  the  IPO,  YPF's  shares,  via  the  ADRs,  were  traded
publicly on the NYSE and other exchanges.    Petersen I, 895 F.3d at
200.

On April 16, 2012, the Republic "exercised indirect control"
of Repsol's 51% of YPF's Class D shares, specifically the right to
"use its shares to govern the company," "direct corporate policy,"
or  "otherwise  exercise  all  the  considerable  power  of  a  majority
shareholder."    Petersen Energía Inversora, S.A.U. v. Argentine
Republic et al. ("Petersen III"), 15 Civ 2739 (LAP), 16 Civ. 8569
(LAP), 2023 WL 5827596, at *1 (S.D.N.Y. Sept. 8, 2023).

On May 3, 2012, the Republic enacted Law 26,741 (the "YPF
Expropriation Law"), which became effective on May 7, 2012, id. at
*3, and "was intended to escape the obligation to pay the tender
offer," id. at *4.    Article 15 of the YPF Expropriation Law states
that  YPF  "shall  continue  to  operate  as  [a]  publicly  traded
corporation[]."    (Petersen dkt. no. 578, Ex. 1.)    Article 16
requires the Republic to execute the Class D Shares pursuant to
various    principles,    including    in    a    manner    "safeguarding
shareholder interest and generating value on their behalf."    (Id.)
Additionally, Article 10 states that the Republic's expropriation
of  the  Class  D  Shares  from  Repsol  is  conducted  for  the  "public
interest" and prohibits "any future transfer of the shares without
permission  of  the  National  Congress  by  a  two-thirds  vote  of  its

members."[10]   (Id.; Petersen dkt. no. 470-7 Articles 4-5
(Expropriation must include a declaration of public utility.).)
As a result of the expropriation, the Republic holds 51% of YPF's
Class D Shares.[11]

Both the Republic's Class A Shares and Class D Shares are
uncertificated securities held in book-entry form[12] in an account
at Caja de Valores, S.A. ("CdV"), the central securities depository
of Argentina.  (Costantini Decl. 1 Ex. 1 at 92.)   The Republic
holds the shares at CdV directly, rather than in "street name"
through a broker or other intermediary.  (Santiago Decl. Ex. P.);
see also Pl. Mem. at 15.)  When book-entry shares are transferred
from one owner to another, no physical transfer occurs; instead,
the transfer is noted in the registry.  (Petersen dkt. no. 559,
Ex. 14 at 32 ("If securities are dematerialized: May dematerialized
security positions be re-certificated and held outside the CSD?
No.").)

---

[10] The Court does not opine on whether this law applies to voluntary
transfers only or to voluntary transfers and transfers made
necessary by a court order. (Def. Opp'n at 8; Pl. Reply at 4-5.)
[11] YPF's Form 20-F for the year ended December 31, 2023 confirms
that the "Argentine National State" owns 200.6 million Class D
shares of YPF (51% of the total). (Costantini Decl. 1 Ex. 1 at
90.)
[12] Section 7(a) of YPF's bylaws states that its shares, which
includes both Class A Shares and Class D Shares, "shall not be
evidenced by certificates but shall be book-entry and registered
in accounts bearing the names of the holders thereof, maintained
with the Company, authorized commercial or investment banks or
custodians as shall be resolved by the board of directors."
(Santiago Decl. Ex. P.)

Since April 2012, the Republic has controlled YPF's major business and financial decisions through its majority share of the company.  The parties agree that the Republic votes to elect the Board and to approve initiatives generally proposed by the Board, including those that require shareholder approval under the Republic's laws.  (Pl. Mem. at 4-5, 12-14; Def. Opp'n at 5-6.)[13]

Additionally, as disclosed in YPF's Form 20-F for the year ended December 31, 2013: "The Argentine federal government controls the Company, and consequently, the federal government is able to determine substantially all matters requiring approval by a majority of our shareholders, including the election of a majority of our directors, and is able to direct our operations." (Costantini 1 Decl. Ex. 5 at 10.)  As disclosed in YPF's Form 20-F for the year ended December 31, 2022:

> The Argentine Republic owns 51% of the shares of YPF S.A. and, consequently, the Argentine government is able to decide all matters requiring approval by a majority of shareholders[.] . . . We cannot assure you that decisions taken by our controlling shareholder would not differ from your interests as a shareholder.

(Petersen dkt. no. 559, Ex. 1 at 6.)

More recently, YPF continues to tap into the United States' markets by: (i) sponsoring the ADR program for its Class D shares with BNYM and listing the shares on the NYSE, which requires

---

[13] The Court notes that the Republic's Class A shares grant it additional rights on top of those awarded to Class D shareholders. (Pl. Mot. at 4; Def. Opp'n at 4.)

maintaining the registration of its Class D shares and ADSs with the SEC; and (ii) offering bonds on the debt capital markets. (Costantini Decl. 1 Exs. 4, 6, 9-10.)

## II. **Applicable Law**

Federal Rule of Civil Procedure 69(a)(1) provides that the "procedure on execution" and "proceedings supplementary to and in aid of judgment or execution" enforcing a money judgment "must accord with the procedure of the state where the court is located." See, e.g., All. Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A., 190 F.3d 16, 20 (2d Cir. 1999).  In New York, NY CPLR § 5201 establishes what property is subject to enforcement and who the proper garnishee is.[14]  NY CPLR § 5225 provides the mechanism for courts to order the payment or delivery of the property.  In addition, the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1610(a), addresses enforcement against a foreign sovereign.

### a. NY CPLR § 5201

NY CPLR § 5201(b) states that judgments are only enforceable "against any property which could be assigned or transferred." New York law controls whether shares in a foreign corporation "could be assigned or transferred" under NY CPLR § 5201(b).  See, e.g., 245 Park Member LLC v. HNA Grp. (Int'l) Co. Ltd., No. 23-

---

[14] A "garnishee" is a person who owes a debt to a judgment debtor, or a person other than the judgment debtor who has property in his possession or custody in which a judgment debtor has an interest. N.Y. C.P.L.R. § 105(i).

842-CV, 2024 WL 1506798, at *3 (2d Cir. Apr. 8, 2024) (New York law controls whether membership interest in Delaware LLC is assignable and transferable); Hotel 71 Mezz Lender LLC v. Falor, 14 N.Y.3d 303, 314 (2010) (same). And, under New York law, shares in a company are freely transferable and assignable. See, e.g., Koehler v. Bank of Berm. Ltd., 12 N.Y.3d 533, 541 (2009).

NY CPLR § 5201(c), titled "proper garnishee for particular property or debt," outlines who the proper garnishee is for certain property. NY CPLR § 5201(c)(4) states that

> where property . . . is evidenced by a . . . negotiable document of title or a certificate of stock of an association or corporation, the . . . document or certificate shall be treated as property capable of delivery and the person holding it shall be the garnishee.

It further states,

> except that section 8—112 of the uniform commercial code shall govern the extent to which and the means by which any interest in a certificated security, uncertificated security or security entitlement (as defined in article eight of the uniform commercial code) may be reached by garnishment, attachment or other legal process.[15]

---

[15] Defendant argues that NY UCC § 8-110(a)(5) provides that the "local law of the issuer's jurisdiction," here Argentine law, "governs . . . whether an adverse claim can be asserted against a person to whom transfer of a[n] . . . uncertificated security is registered or a person who obtains control of the uncertificated security." (Def. Opp'n at 23 (emphasis added).) The Court is unpersuaded because Plaintiff does not assert an "adverse claim" to the Shares; on the contrary, Plaintiff acknowledges that the Republic validly owns the Shares, which is why Plaintiff argues that they should be subject to execution governed by New York law and the FSIA. F.R.C.P. 69(a)(1) (New York law governs execution procedure here).

The Republic's Shares qualify as "uncertificated securit[ies]" under the UCC because they exist only in book-entry form.[16]  Under NY UCC § 8-112, Plaintiff may reach Defendant's uncertificated securities by (1) legal process upon the issuer at its chief executive office in the United States, (§ 8-112(b)); (2) legal process upon the secured party, (§ 8-112(d));[17] or (3) "aid from a court of competent jurisdiction, by injunction or otherwise, in reaching the certificated security, uncertificated security, or security entitlement or in satisfying the claim by means allowed at law or in equity in regard to property that cannot readily be reached by other legal process," (§ 8-112(e)).

---

[16] NY UCC § 8-102(18) defines "uncertificated security" as "a security that is not represented by a certificate."  The term "security entitlement" refers to the rights and property interest of a person who holds securities indirectly through a broker or other securities intermediary.  See N.Y. U.C.C. § 8-102(7), (17).  The Shares are not "security entitlement[s]" because they are registered to the Republic and not held in street name.  N.Y. U.C.C. § 8-102(7), (17); see also N.Y. U.C.C. § 8-501(d) ("If a securities intermediary holds a financial asset for another person, and the financial asset is registered in the name of . . . the other person, and has not been indorsed to the securities intermediary or in blank, the other person is treated as holding the financial asset directly rather than as having a security entitlement with respect to the financial asset.").

[17] Because the Republic holds the Shares directly through CdV, as opposed to in street name through a broker or other intermediary, they are "uncertificated securit[ies] registered in the name of a secured party."  N.Y. U.C.C. § 8-112(d).

### b. NY CPLR § 5225[18]

NY CPLR § 5225(a) sets forth New York's procedure for enforcement of money judgments against property in the possession or custody of the judgment debtor. See, e.g., Koehler, 12 N.Y.3d at 537-38. It provides that

> where it is shown that the judgment debtor is in possession or custody of money or other personal property in which he has an interest, the court shall order that the judgment debtor pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor. . . .

N.Y. C.P.L.R. § 5225(a). NY CPLR § 5225(b) applies when the property is not in the judgment debtor's possession. Koehler, 12 N.Y.3d at 541. It provides that the Court may order a third-party garnishee to turn over the property – but only "upon a special proceeding" commenced against that garnishee. N.Y. C.P.L.R. § 5225(b).

Under either NY CPLR §§ 5225(a) or (b), control is not enough: the judgment debtor (§ 5225(a)) or a third-party garnishee (§ 5225(b)) must have "possession or custody." Commonwealth of N. Mariana Islands v. Canadian Imperial Bank of Com., 990 N.E.2d 114, 115 (N.Y. 2013) (under NY CPLR § 5225(b) third-party garnishee

---

[18] The Republic argues that NY CPLR § 5225 applies only to a "person," which does not include sovereigns. (Def. Opp'n at 24 n. 16.) However, the Court finds that § 5225 must apply to sovereigns, at least where the sovereign owes a commercial debt and is being asked to pay that debt with commercial assets. (Dkt. no. 82.)

"must have actual, not merely constructive, possession or custody of the assets").

Additionally, NY CPLR § 5225(c) provides that "[t]he court may order any person to execute and deliver any documents necessary to effect payment or delivery."

Turnover orders pursuant to NY CPLR § 5225 are effective against assets regardless of their location if the Court has personal jurisdiction over the judgment debtor or the third-party garnishee.  In Koehler, the New York Court of Appeals expressly addressed funds held outside of New York, holding that "CPLR article 52 contains no express territorial limitation barring the entry of a turnover order that requires . . . [the transfer of] money or property into New York from another state or country." 12 N.Y.3d at 539, 541 ("[A] New York court with personal jurisdiction over a defendant may order him to turn over out-of-state property. . . ."); see also Motorola Credit Corp. v. Uzan, 739 F. Supp. 2d 636, 641 (S.D.N.Y. 2010) (same); In re Gaming Lottery Sec. Litig., No. 96 Civ. 5567 (RPP), 2001 WL 123807, at *3 (S.D.N.Y. Feb. 13, 2001) (noting that the Court "has the power under CPLR § 5225(a) to order a turnover of funds held in another jurisdiction" and ordering the turnover of funds "in an account at the Royal Bank of Scotland"); In re Feit & Drexler, Inc. v. Drexler, 760 F.2d 406, 414 (2d Cir. 1985) (holding that the district court, sitting in bankruptcy, had the power to compel the

defendant to deliver property from outside the court's territorial jurisdiction because the court had personal jurisdiction over the defendant); <u>Miller v. Doniger</u>, 814 N.Y.S.2d 141 (2006) (affirming order directing the judgment debtor to "turn over his out-of-State Wachovia account"); <u>Starbare II Partners L.P. v. Sloan</u>, 629 N.Y.S.2d 23 (1995) (directing the defendant to turn over artwork located outside the state pursuant to NY CPLR 5225(a)).

In <u>Bainbridge Fund Ltd. v. Republic of Argentina</u>, this Court found that it has the power to order a sovereign to bring assets held in that sovereign country's central bank and deliver them to New York.  690 F. Supp. 3d 411, 421-22 (S.D.N.Y. 2023).  "The FSIA . . . does not supersede CPLR 5225 and prevent the Court from ordering the Republic, a judgment debtor over which it has personal jurisdiction, to bring assets from outside of New York into New York to pay [Plaintiff]."  <u>Id.</u> at 416.  The Court further stated that "[t]he execution immunity provision of the FSIA is no bar because by its plain terms it 'immunizes only foreign-state property '<u>in the United States</u>.''"  <u>Id.</u> (citation omitted). Additionally, the Court determined that the "more prudent course" is to evaluate whether the assets are subject to execution immunity before ordering that they be brought to the United States.  <u>Id.</u> at 417.

### c. Foreign Sovereign Immunities Act, 28 U.S.C. § 1610(a)

Under the FSIA,

[t]he property in the United States of a foreign state . . .
used for a commercial activity in the United States, shall
not be immune from attachment in aid of execution, or from
execution, upon a judgment entered by a court of the United
States or of a State after the effective date of this Act, if
. . . the foreign state has waived its immunity from
attachment in aid of execution or from execution either
explicitly or by implication, notwithstanding any withdrawal
of the waiver the foreign state may purport to effect except
in accordance with the terms of the waiver,. . . .

28 U.S.C. § 1610(a)(1).  Accordingly, to be amenable to execution

under this section, property of a foreign state must satisfy three

requirements: (1) it must be "in the United States;" (2) it must

be "used for a commercial activity in the United States;" and (3)

the foreign state must have "waived its immunity from attachment."

Id.  In other words, the sovereign must use the property but may

do so anywhere,[19] and the activity must occur in the United States but may be conducted by anyone.[20]

Plaintiff has the initial burden of production to show that an exception to foreign sovereign immunity under the FSIA applies. Beierwaltes v. L'Office Federale de la Culture de la Confederation Suisse (Fed. Office of Culture of the Swiss Confederation), 999 F.3d 808, 816-17 (2d Cir. 2021); see also Bainbridge Fund Ltd., 690 F. Supp. 3d at 419.  Defendant then bears the burden of proving, by a preponderance of the evidence, that the alleged exception does not apply.  Id.

### d. Preliminary Injunction

A preliminary injunction is an "extraordinary remedy." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  A

---

[19] The Republic argues that the statute requires that the "use" occur in the United States, as opposed to requiring that the commercial activity occur in the United States.  (Def. Opp'n at 13-17.)  The Court disagrees.  What matters is not where the Shares were used, but where the resulting commercial activity takes place. Exp.-Imp. Bank of the Republic of China v. Grenada, 768 F.3d 75, 89-91 (2d Cir. 2014) (declining to attach funds "because they are not used by the Statutory Corporations for commercial activity that takes place in the United States" (emphasis added)); Attestor Master Value Fund LP v. Argentina, 113 F.4th 220, 233 (2d Cir. 2024) (the FSIA required that "the commercial activity in which Argentina used [the property] took place at least in part in the United States." (emphasis added)); But see Aurelius Cap. Partners, LP v. Republic of Argentina, No. 07 Civ. 11327 (TPG), 2010 WL 768874, at *4 (S.D.N.Y. Mar. 5, 2010) ("even if the property is being used for commercial activity, this use is not occurring in the United States").
[20] The Republic argues that the commercial activity must be carried out by the foreign state.  (Def. Opp'n at 17-21.)  However, that requirement is not found in the statute.

party seeking a preliminary injunction ordinarily must show "(1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor." Doninger v. Niehoff, 527 F.3d 41, 47 (2d Cir. 2008).

### III. Discussion

The Republic opposes the entry of the proposed order by arguing, inter alia, that (1) the Shares are immune from turnover under the FSIA, (see infra Sections III.a. and III.c.); (2) Plaintiff has not shown that the assets are subject to turnover under New York law, (see infra Section III.b.); and (3) international comity counsels against it, (see infra Section III.d.).  Additionally, the Republic argues that the proposed preliminary injunction is not warranted, (see infra Section III.e.).  The Court addresses each argument in turn.

### a. Whether the Shares are Immune from Execution under the FSIA

Because the Court determined in Bainbridge that the "more prudent course" is to "evaluate whether the assets are otherwise subject to execution immunity before ordering that they be brought to the United States," 690 F. Supp. 3d at 417, the Court first turns to whether two elements of an exception under the FSIA are

met: (i) the Shares must be "used for a commercial activity in the
United States;" and (ii) it must be (or have been) "used for the
commercial activity upon which the claim is based."  28 U.S.C.
§ 1610(a)(2).

### i. Whether the Shares are "Used for a Commercial Activity in the United States"

To satisfy this element, the Republic must "actively utilize
[the Shares] in service of that commercial activity [in the United
States]."  Exp.-Imp. Bank of the Republic of China v. Grenada, 768
F.3d 75, 90 (2d Cir. 2014); see also id. at 89 (". . . when the
property in question is put into action, put into service, availed
or employed for a commercial activity . . .").

YPF sponsoring an ADR program for its Class D shares with
BNYM in New York, listing its shares on the NYSE, registering its
shares with the SEC, and selling its debt to United States
institutional investors under SEC Rule 144A, all constitute
"commercial activity in the United States."  See, e.g., EM Ltd. v.
Republic of Argentina, 389 F. App'x 38, 44 (2d Cir. 2010)
(facilitating investment and sale of securities is "commercial
activity" under the FSIA); Republic of Argentina v. Weltover, Inc.,
504 U.S. 607, 615-17 (1992) (issuing bonds is commercial activity).
The question for the Court's consideration is whether the Republic
used its Shares "for [the] commercial activity in the United
States."  28 U.S.C. § 1610 (a).

In *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 152 (3d Cir. 2019), the Third Circuit affirmed attachment of Petróleos de Venezuela, S.A.'s ("PDVSA") (Venezuela's state oil company and its alter ego) controlling shares in PDV Holding, Inc. ("PDVH") (a separate entity whose corporate veil was not pierced). The Court observed that PDVSA used its shares in PDVH "to run its business as an owner, to appoint directors, approve contracts, and to pledge PDVH's debts for its own short-term debt." *Id.* at 151. Accordingly, the Court held that PDVSA used its shares in PDVH for a commercial activity in the United States by directing the activities of PDVH in the United States and thus the PDVH shares were subject to execution under § 1610(a). *Id.* at 151-52; *see also Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 450 (D.C. Cir. 1990) (holding that Iran engaged in commercial activity when it "used its majority position" in a dairy company "to lock Foremost out of the management of the company and deny Foremost its share of the company's earnings."). Similarly, in *In re 650 Fifth Ave. Co.*, No. 08 Civ. 10934 (KBF), 2014 WL 1284494 (S.D.N.Y. Mar. 28, 2014), *vacated and remanded sub nom. Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107 (2d Cir. 2016), and *vacated and remanded*, 830 F.3d 66 (2d Cir. 2016), the Court held that Iranian front companies "used" partnership shares in a real estate company for commercial activity in the United States, because: (i) the

company owned a building in New York that generated revenue; and (ii) the shares "were the mechanism through which the partners owned the Building and determined the distribution of revenue that it produced." Id. at *17.[21]  Accordingly, a foreign sovereign's use of its controlling shares to direct a company's commercial activity in the United States satisfies the FSIA requirement that the shares be "used for a commercial activity in the United States."

Each year YPF advises United States investors that the Republic exercises a high degree of control over YPF.[22]  Since April 2012, the Republic has controlled YPF's major business and financial decisions through its majority share ownership and generated value for the company through use of the United States' markets.  The parties agree that the Republic votes to elect the

---

[21] On appeal, the Court of Appeals vacated the district court's prior alter ego finding and therefore the Court of Appeals did not address the district court's FSIA analysis.  Kirschenbaum v. 650 Fifth Ave. Co., 830 F.3d 107 (2d Cir. 2016).

[22] As disclosed in YPF's Form 20-F for the year ended December 31, 2013: "The Argentine federal government controls the Company, and consequently, the federal government is able to determine substantially all matters requiring approval by a majority of our shareholders, including the election of a majority of our directors, and is able to direct our operations."  (Costantini Decl. 1 Ex. 5 at 10.)  As disclosed in YPF's Form 20-F for the year ended December 31, 2022: "The Argentine Republic owns 51% of the shares of YPF S.A. and, consequently, the Argentine government is able to decide all matters requiring approval by a majority of shareholders[.] . . . We cannot assure you that decisions taken by our controlling shareholder would not differ from your interests as a shareholder."  (Petersen dkt. no. 559, Ex. 1 at 6.)

Board and to approve initiatives generally proposed by the Board, including those that require shareholder approval under the Republic's laws like international debt issuances and the delisting of its shares from the NYSE.[23] (Santiago Decl. Ex. P; Pl. Mem. at 4-5, 12-14; Def. Opp'n at 5-6.) For example, at an annual shareholder meeting held on April 29, 2016, the Republic voted to approve an increase in the amount of YPF's Global Medium-Term Notes Program from $2.0 billion to $10.0 billion. (Costantini Decl., Ex. 4 (Coffee 4 ¶ 29).) Similarly, at a meeting held on April 28, 2023, the Republic granted the Board of Directors the authority "to create Global Programs for the issuance of negotiable obligations." (Costantini Decl. 1 Ex. 6 at 23, 26.) Since April 2012, YPF has sold more than $2.4 billion in debt just to United States investors. (Costantini Decl., Ex. 4 (Coffee 4 ¶ 14).) Accordingly, the Republic's use of its controlling shares to direct YPF's commercial activity in the United States is sufficient to establish that the Shares are "used for a commercial activity in the United States."

---

[23] The Court does not address whether all of YPF's commercial activity in the United States is attributable to the Republic merely because the Republic holds a majority share in YPF; instead, the Court focuses on the commercial activity in the United States that the parties agree requires the Republic's direct approval.

### ii. Whether the Republic Waived its Immunity From Execution

The underlying Form of Securities Agreement and Specimen Note executed by the Republic and governing the bonds at issue in this case include an agreement from the Republic that

> [t]o the extend that the Republic or any of its revenues, assets or properties shall be entitled . . . to any immunity from suit . . . from execution of a judgment or from any other legal or judicial process or remedy . . . the Republic has irrevocably agreed not to claim and has irrevocably waived such immunity to the fullest extent permitted by the laws of such jurisdiction and consents generally for the purposes of the [FSIA] to the giving of any relief . . . in connection with any . . . Related Judgment, provided that attachment prior to judgment or attachment in aid of execution shall not be ordered by the Republic's courts with respect to (i) the assets which constitute freely available reserves pursuant to Article 6 of the Convertibility Law . . . .

(Dkt. no. 61-1 at 12.) Accordingly, for the purpose of § 1610(a)(1) of the FSIA, the Republic waived its immunity from execution.

### b. Whether the Shares are Immune from Turnover Under New York Law

Because the Shares are "used for a commercial activity in the United States" and "used for the commercial activity upon which the claim is based," and therefore are not otherwise subject to execution immunity, the Court now analyzes whether the Shares are subject to turnover under New York law. 28 U.S.C. § 1610(a)(2); Bainbridge, 690 F. Supp. 3d at 417.

i. **Whether the Shares Can be Transferred under NY CPLR § 5225**

Under New York law, the Court must first determine if the property is subject to enforcement and who the proper garnishee is. N.Y. C.P.L.R. § 5201. Under NY CPLR § 5201(b), the Shares "could be assigned or transferred," regardless of Article 10 of the YPF Expropriation Law's restriction, (see _infra_ Section III.c.). Since May 21, 2014, each "Constancia de Acciones" (Proof of Shares) issued by CdV confirms that the Shares are fully transferable, without any restriction. (_Petersen_ dkt. no. 591, Ex. 1.) Additionally, as recently as May 2024, the Milei administration has reaffirmed its intention to reprivatize YPF, a process that would necessarily involve the transfer of the Shares. (Costantini Decl. 2, Ex. 4.)

NY CPLR § 5201(c) outlines who the proper garnishee is for "particular property." Given the Shares are uncertificated securities, they fall within the category of "particular property" and thus lead the Court to the conclusion that

> the person holding [the Shares] shall be the garnishee; except that section 8—112 of the uniform commercial code shall govern the extent to which and the means by which any interest in a certificated security, uncertificated security or security entitlement (as defined in article eight of the uniform commercial code) may be reached by garnishment, attachment or other legal process.

N.Y. C.P.L.R. § 5201 (c)(4). Under NY UCC § 8-112, Plaintiff may reach the Shares by (1) legal process upon the issuer at its chief

executive office in the United States (§ 8-112 (b)); (2) legal
process upon the secured party (§ 8-112 (d)); or (3) "aid from a
court of competent jurisdiction, by injunction or otherwise, in
reaching the certificated security, uncertificated security, or
security entitlement or in satisfying the claim by means allowed
at law or in equity in regard to property that cannot readily be
reached by other legal process" (§ 8-112 (e)).  While control is
not enough to prove "possession or custody" under federal common
law, the statutes (NY CPLR § 5201(c) and NY UCC § 8-112(d)) aid
the Court in identifying who is in "possession or custody" and
therefore appropriate to bring the proceedings against under NY
CPLR § 5225.  Commonwealth of N. Mariana Islands, 990 N.E.2d at
115.  Because NY UCC § 8-112(d) states that the Shares can be
reached by legal process upon the secured party, here, the
Republic, this aids the Court in concluding that the Republic
"holds" or has "possession or custody" of the Shares for purposes
of applying NY CPLR § 5225(a).  Accordingly, Plaintiff
appropriately moved for turnover under New York law.

### ii. Whether the Shares are Immune from Turnover by Being Outside the United States

Regarding whether the Shares are immune from turnover by
virtue of being outside of the United States, the Court previously
ruled on this exact issue in Bainbridge, 690 F. Supp. 3d at 416.
Here, the Court similarly holds that the FSIA does not supersede

NY CPLR § 5225 and prevent the Court from ordering the Republic, a judgment debtor over which it has personal jurisdiction, to bring the Shares from outside of New York into New York to pay Plaintiff.

### c. Whether the Shares Qualify as "in the United States" under Section 1610(a) of the FSIA Once Transferred

The Court must determine whether the Shares would qualify as property of the Republic "in the United States" under Section 1610(a) of the FSIA after the Court orders the Republic to take the following two steps: (i) transfer forthwith the Shares to a global custody account at BNYM in New York for turnover to Plaintiff; and (ii) instruct BNYM to transfer the Republic's ownership interests in the Shares to Plaintiff or their designees.[24]

A global custody account is an account that indirectly holds foreign securities on behalf of an investor.  More specifically,

---

[24] The Republic asserts that "Plaintiff does not-because it cannot-point to any 'global custody' account of the Republic's at BNYM, nor does it present any evidence that the Court would have the power to compel BNYM to create such an account.  Indeed, BNYM is not even before the Court and therefore cannot be ordered to create a wholly new commercial relationship with the Republic (even if BNYM and the Republic or YPF have other, separate commercial relationships)."  (Def. Opp'n at 12.)  BNYM historically had contractual relationships with both the Republic (for which it serves as trustee and paying agent on sovereign debt issuances) and YPF (for which it maintains the ADR program and serves as depositary).  While the Republic may not have an existing global custody account with BNYM, NY CPLR § 5225(c) requires that the Republic will execute and deliver any documents necessary to set up such an account.  Gryphon, 41 A.D.3d at 39 (ordering judgment-debtor under NY CPLR § 5225(c) to "execute appropriate documents" to transfer shares in foreign corporations to plaintiffs).

a global custody account (BNYM in New York) maintains a network of
local sub-custodians in foreign markets, and each sub-custodian in
turn is a member of the central securities depositary in its own
market (Argentina). (Costantini Decl. 1 Ex. 13, ii-iv; Costantini
Decl. 1 Ex. 14.)  Transferring the Shares to a global custody
account at BNYM in New York means that CdV would identify BNYM's
sub-custodian as the beneficial owner, but the Shares would remain
in the register maintained by CdV in Argentina. (Pl. Mem. at 15-
16; Def. Opp'n at 6, 13.)  Once the Shares are transferred into a
global custody account at BNYM in New York, the Republic's
ownership interest in the Shares will qualify as security
entitlements. N.Y. U.C.C. §§ 8-102(7), (17); N.Y. U.C.C. § 8-112,
Official Cmts., ¶ 3.  The Republic's security entitlements will
have a New York situs, because the global account will be held at
the New York office of BNYM. JPMorgan Chase Bank, N.A. v. Herman,
168 A.3d 514, 521-22 (Conn. App. Ct. 2017) (judgment-debtor's
security entitlement had Connecticut situs under UCC § 8-112
because its account was with Connecticut office of brokerage firm,
even though securities certificates were held by securities
depositary in New York); EM Ltd. v. Republic of Argentina, 389 F.
App'x 38, 43-44 (2d Cir. 2010) (holding that Argentina's beneficial
interests in trust had New York situs and were attachable under
FSIA, even though corpus of trust consisted of ADSs that
represented interests in shares of Argentine corporation).

Accordingly, the Republic's ownership interest in the Shares will qualify as property "in the United States," as required by the FSIA after the Court orders the Republic to take the two proposed steps.

### d. Whether International Comity Counsels Against Granting the Proposed Order[25]

The Republic argues that international comity counsels against granting the proposed order. The "fundamental principle of international comity" is that "a state may not require a person to do an act in another state that is prohibited by the law of that state or the law of the state of which he is a national." Motorola Credit Corp. v. Uzan, 388 F.3d 39, 60 (2d Cir. 2004) (citations omitted). Additionally, under the act-of-state doctrine, courts cannot "declar[e] invalid, and thus ineffective as a rule of decision, . . . the official act of a foreign sovereign." Celestin v. Caribbean Air Mail, Inc., 30 F.4th 133, 137 (2d Cir. 2022) (internal quotation marks and citation omitted). The Court previously recognized the expropriation of the Shares as

---

[25] Prescriptive comity refers to "the respect sovereign nations afford each other by limiting the reach of their laws." Hartford Fire Ins. Co. v. California, 509 U.S. 764, 817 (1993). Prescriptive comity is distinct from "adjudicative comity," which "asks whether, where a statute might otherwise apply, a court should nonetheless abstain from exercising jurisdiction in deference to a foreign nation's courts that might be a more appropriate forum for adjudicating the matter." In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 100-01 (2d Cir. 2019).

"a valid act." <u>Petersen Energia Inversora, S.A.U. v. Argentine
Republic et al.</u>, No. 15 Civ. 2739 (LAP), 2016 WL 4735367, at *8
(S.D.N.Y. Sept. 9, 2016), <u>aff'd in part, appeal dismissed in part
sub nom. Petersen I</u>, 895 F.3d.

The Republic argues that Plaintiff's requested relief would
require the Republic either to change its laws or violate them.[26]
The Republic points to Article 10 of the YPF Expropriation Law,
which forbids any transfer of the Class D Shares without permission
of the National Congress by two-thirds vote of its members, and

---

[26] The Court does not evaluate the parties' arguments regarding
international comity as it pertains to the analysis of NY CPLR
§ 5225 and the FSIA because the Court relies on its decision in
<u>Bainbridge</u>, 690 F. Supp. 3d at 411. In addition, the FSIA already
reflects Congress's resolution of comity principles in execution
proceedings against a foreign state. <u>Republic of Austria v.
Altmann</u>, 541 U.S. 677, 699 (2004) (Comity principles in the FSIA
provide a "comprehensive framework for resolving any claim of
sovereign immunity."); <u>accord</u> <u>Dole Food Co. v. Patrickson</u>, 538
U.S. 468, 479 (2003) (The FSIA already grants immunity to foreign
states and their property "as a gesture of comity."); <u>see also
Thai Lao Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's
Democratic Republic</u>, No. 10 Civ. 5256 (KMW) (DCF), 2013 WL 1703873,
at *7 (S.D.N.Y. Apr. 19, 2013). <u>But see</u> <u>Peterson v. Islamic
Republic of Iran</u>, 876 F.3d 63, 94 & n.23 (2d Cir. 2017), <u>vacated
on other grounds</u>, <u>Clearstream Banking S.A. v. Peterson</u>, 140 S. Ct.
813 (2020) (Comity questions left open by the FSIA include whether
"a court order will infringe on sovereign interests of a foreign
state."); <u>Republic of Argentina v. NML Cap., Ltd.</u>, 573 U.S. 134,
142-46 & nn.4 & 6 (2014) (holding that a comity analysis may be
appropriate when ordering discovery about a foreign state's
assets, because the FSIA has "nothing to say" about that
discovery); <u>Aurelius Cap. Master, Ltd. v. Republic of Argentina</u>,
589 F. App'x 16, 18 (2d Cir. 2014) (same).

the Permanent Supplementary Budget Law, which provides for payments only of final judgments.[27]

International comity comes into play only when there is a true conflict between the law of the United States and that of a foreign jurisdiction.  In re Maxwell Commc'n Corp., 93 F.3d 1036, 1049 (2d Cir. 1996) ("International comity comes into play only when there is a 'true conflict' between American law and that of a foreign jurisdiction."); Hartford Fire Ins. Co., 509 U.S. at 799 (A "true conflict" exists only if it would be "impossible" for a party to comply with the laws of both countries.).

There is no unavoidable conflict between Argentine law and Plaintiff's requested relief.  The Republic has several choices it can legally pursue: (1) receive the permission of the National Congress by two-thirds vote, (2) take action to change the law, or (3) satisfy the judgment through a separate agreement with Plaintiff.  Courts have enjoined sovereigns to act within their own territory where necessary.  See, e.g., NML Cap., Ltd. v. Republic of Argentina, 699 F.3d 246, 254-55, 263 (2d Cir. 2012)

---

[27] The Republic also points to the fact that under Section 6 of the bylaws, only the National Government can be the holder of Class A shares; however, Class A shares transferred by the National Government to any person, "shall be converted into Class D shares, except [for] transfers to the Provinces, if previously authorized by law, in which case they will not be converted into another class." (Santiago Decl. Ex. P.)  Accordingly, this is not a true conflict.

(affirming injunction requiring Argentina to specifically perform its obligations under equal treatment provision in bonds).

Assuming arguendo, that there is a true conflict between Plaintiff's requested relief and Argentine laws, comity considerations counsel in favor of granting Plaintiff's requested relief. The United States has a strong interest in enforcing its judgments, and that interest outweighs any putative Argentine interest in avoiding execution on assets that are fully subject to execution under the FSIA.[28] JW Oilfield Equip., LLC v. Commerzbank AG, 764 F. Supp. 2d 587, 596-98 (S.D.N.Y. 2011) (requiring German bank to turn over funds in judgment-debtor's account in violation of German law, based on the United States' "strong interest in enforcing its judgments").

---

[28] Defendant argues that this will put the United States at jeopardy "given the possibility of reciprocal adverse treatment of the United States in foreign courts." (Def. Opp'n at 9.) See Fed. Republic of Germany v. Philipp, 592 U.S. 169, 184 (2021) ("We interpret the FSIA as we do other statutes affecting international relations: to avoid, where possible, producing friction in our relations with [other] nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation.") (internal quotation marks and citations omitted). While it is the Court's view that this concern is addressed in the FSIA requirements, this "apprehension[] [is] better directed to that branch of government with authority to amend. . . ." Republic of Argentina, 573 U.S. at 146; see also Turkiye Halk Bankasi A.S. v. United States, 598 U.S. 264, 280 (2023) ("In the context of a civil proceeding, this Court has recognized that a suit not governed by the FSIA 'may still be barred by foreign sovereign immunity under the common law.'" (citations omitted)).

Foreign governments cannot simply override the exceptions to the FSIA by invoking its own law to shield its assets from execution in the United States.  If comity could supersede the FSIA and allow foreign law to control which sovereign assets are subject to execution, every foreign state could render itself judgment-proof in United States courts just by passing a law requiring its own approval for any transfer of its property.  Simon v. Republic of Hungary, 911 F.3d 1172, 1180 (D.C. Cir. 2018) (rejecting Hungary's comity-based argument that "would in actuality amount to a judicial grant of immunity"), vacated on other grounds, 141 S. Ct. 691 (2021); De Csepel v. Republic of Hungary, 27 F.4th 736, 753 (D.C. Cir. 2022) (reaffirming Simon's rejection of Hungary's comity-based argument on same ground).

While the Republic demands that this Court extend comity, it simultaneously refuses to make any effort to honor the Court's unstayed judgment.  NML Cap., Ltd. v. Republic of Argentina, 2015 WL 1087488, at *7 (S.D.N.Y. Mar. 12, 2015) ("[I]f Citibank's predicament is a matter of comity, it is only because the Republic has refused to observe the judgments of the court to whose jurisdiction it acceded.  Comity does not suggest abrogating those judgments, or creating exceptions to the Injunction designed to enforce them."); see also Motorola Credit Corp., 388 F.3d at 60 (declining to grant comity to Turkish injunction prohibiting turnover of shares because "orders of foreign courts are not

entitled to comity if the litigants who procure them have
deliberately courted legal impediments to the enforcement of a
federal court's orders" (internal quotation marks and citations
omitted)). Comity is not a one-way street.

Accordingly, while the Court need not engage in a comity
analysis, those comity considerations counsel in favor of granting
the proposed order.

### e. Whether a Preliminary Injunction is Warranted

Plaintiff moves for a preliminary injunction to enjoin

> the Republic from taking, and from causing or permitting YPF,
> or any director of YPF, or any other person or entity to so
> take, any action that is intended to, or would have the effect
> of, (i) amending in any way, the rights of any class of YPF
> shares, including but not limited to, the right of the
> holder(s) of shares of any such class to elect one or more
> directors, (ii) amending the voting or other rights or powers
> with respect to any directors of YPF (including by way of
> changing the number of directors constituting such board),
> including the rights of any such director to serve on any
> committee, or (iii) amending the right of any class of YPF
> shares with respect to dividends or receiving assts of YPF
> upon its dissolution.

(Pl. Mot.)

In Gutman v. Klein, the defendant was ordered to turn over a
set of shares. No. 03 Civ. 1570 (BMC), 2016 WL 426510, at *5
(E.D.N.Y. Feb. 3, 2016). When he failed to do so, he argued that
he was not in contempt of the court's order because he had already
assigned the shares to another party in fulfillment of another
judgment, thereby mooting the turnover order. Id. The court
rejected this reasoning, finding that the defendant "ignored the

directives of the Turnover Order when he devised his own method of dealing with his shares" and that "[the defendant] is bound by the Turnover Order unless and until I modify the order or release him from it." Id.

Here, Plaintiff's motion for a preliminary injunction is cautious but unnecessary.  As of the date of this order, the Republic cannot change the status of the Shares in a way that would not be in compliance with this order.  Accordingly, Plaintiff's request for a preliminary injunction is DENIED without prejudice to renewal.

### IV.  **Conclusion**

For the reasons set out above, Plaintiff's motion is GRANTED in part and DENIED in part.  Plaintiff's motion for turnover is GRANTED.  The Republic shall (i) transfer the Shares to a global custody account at BNYM in New York within 14 days from the date of this order; and (ii) instruct BNYM to initiate a transfer of the Republic's ownership interests in its Shares to Plaintiff or its designees within one business day of the date on which the Shares are deposited into the account.  Plaintiff's motion for a preliminary injunction is DENIED.

Satisfied that oral argument is not needed in addition to the papers submitted by the parties, the Republic's request for oral argument, (dkt. no. 122), is DENIED.  Doctor's Assocs., Inc. v. Distajo, 66 F.3d 438, 448 (2d Cir. 1995); see also SecurityNational

Mortg. Co. v. Lehman Bros. Holdings Inc., No. 20 MC 00027 (LAK)

(DF), 2020 WL 9815257, at *1 (S.D.N.Y. July 10, 2020).

The Clerk of the Court is respectfully directed to close dkt.

nos. 106 and 122.

**SO ORDERED.**

Dated:     June 30, 2025
           New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge